IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 08-CV-00828-RPM

NOT 1 MORE ACRE!, a Colorado non-profit corporation,
JEAN AGUERRE,
MACK LOUDON, and
JAMES E. HERRELL,

 Plaintiffs,
v.

UNITED STATES DEPARTMENT OF THE ARMY,
ROBERT M. GATES, United States Secretary of Defense,
PETER GEREN, Secretary of the United States Department of the Army, and
CRAIG E. COLLEGE, United States Army Deputy Assistant Chief of Staff for Installation Management,

 Defendants.

---

MEMORANDUM OPINION AND ORDER

---

  On August 2, 2007, the United States Department of the Army ("Army") issued a Record of Decision ("ROD") to increase the use of its Pinon Canyon Maneuver Site ("PCMS") in southeastern Colorado to conduct training of an increased troop population stationed at Fort Carson, Colorado in conformity with a transformation process involving changes in unit organization and training doctrine. As required by the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321, et seq., the Army's decision was made after consideration of the matters addressed in the Final Pinon Canyon Site Transformation Environmental Impact Statement, dated June 2007 ("EIS"). There are two aspects to that document. First, it describes proposed construction of new physical facilities to expand support services in an existing

cantonment area of about 1660 acres to include a brigade support complex, a medical/dental clinic, storage facilities, soldier support facilities (including a chapel, phone center, barbershop, shopping and laundry facilities), a vehicle maintenance facility, motor pools, and upgraded roads and utilities.

Second, it refers to training operations of unspecified duration, frequency and intensity to be conducted on the remainder of the 235,000 acres of the PCMS, requiring the addition of a live hand grenade range, an ammunition holding area, a protective equipment testing facility, and upgrades to an existing small-arms range and communications facilities.

Because the EIS does not adequately assess the impact on the environment of the increase in the intensity and duration of training operations necessary to meet the Army's stated purposes for its action, the Army's reliance on it makes the ROD an arbitrary and capricious action, an abuse of discretion and a decision not in accordance with NEPA, requiring the intervention of this Court under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

The PCMS is a Department of Defense ("DOD") installation located in southeastern Colorado in Las Animas County, approximately 150 miles southeast of Fort Carson and Colorado Springs, Colorado. A.R. 10 at 0000036.[1] No soldiers are permanently stationed at the PCMS. Its primary mission is to support maneuver training exercises for soldiers stationed at Fort Carson. *Id.* at 0000037.

---

[1] The Final PCMS Transformation Environmental Impact Statement is found in the Administrative Record at Document Number 10, pages 0000032-0000932. References to the Administrative Record (A.R.) are designated by document number and bate stamp page number(s), i.e. A.R. 1 at 0000001.

The Army acquired the PCMS in the early 1980s. Previously the land had been used mainly for large grazing operations. *Id.* at 0000191. The PCMS is located along the western margin of the Great Plains. Adjacent private land is zoned for agricultural uses and used for dryland grazing. *Id.* at 0000102 & 0000117. The terrain includes wooded hills, volcanic formations, grassy plains, mesas, dissected plateaus and deep canyons. *Id.* The climate is moderate and dry, with average precipitation of approximately 13 inches per year. *Id.* at 0000099.

When the Army proposed to acquire land in southeastern Colorado for combat maneuver training, it prepared an EIS for Training Land Acquisition to assess the environmental impacts associated with such use. *See* A.R. 254 & 282. The Army selected the Pinon Canyon site even though it was "slightly more fragile" that the alternative Huerfano River site. A.R. 254 at 0013593. The Draft EIS for Training Land Acquisition recognized that land in semi-arid southeastern Colorado cannot accommodate perpetual use for maneuver training. A.R. 282 at 0019768. Accordingly, the amount of land to be acquired must be large enough "to allow for rest and recovery of the land on a rotating basis." *Id.* In assessing the variables to be considered in a Land Use and Management Plan (LUMP), the Army identified Training Intensity and Time of Use as the key variables. *Id.* at 0019769.

Military training operations began at the PCMS in 1985. Since then, the PCMS has been used for training exercises, on average, approximately 4 months per year. A.R. 10 at 0000191.

The Army is undergoing a restructuring process, referred to as "Transformation," to respond to the challenges of the 21st century. *Id.* at 0000057. Three programs are relevant to the Proposed Action addressed in the Final PCMS Transformation EIS:

(1)     Army Modular Force ("AMF") is a program for changing the size of Army units by reorganizing forces into Brigade Combat Teams. All Fort Carson soldiers are being organized into Brigade Combat Teams. *Id.* at 0000059-60. The AMF initiative changes Army training doctrine. *Id.*

(2)     Base Realignment and Closure ("BRAC"), governed by the Base Realignment and Closure Act of 1990 as amended, is "a process by which military installations are closed or realigned to meet the infrastructure, training and force structure requirements of the military and save taxpayers' money." *Id.* at 0000058. Recommendations of the 2005 Base Closure and Realignment Commission became law in November 2005. One of those recommendations was to relocate a Division Headquarters and a Heavy Brigade Combat Team and other support units from Fort Hood, Texas to Fort Carson. *Id.*

(3)     Integrated Global Presence and Basing Strategy ("IGPBS") is a program for assessing the size, character, and location of the military's overseas presence. *Id.* at 0000058-59. As part of that effort, some forces currently based overseas are being returned to the United States over a period of years. The Army has determined that an Infantry Brigade Combat Team from Korea will be stationed at Fort Carson. *Id*.

The combined effect of these programs increases the troop population of Fort Carson to approximately 23,000 soldiers. *Id.* at 0000088. The increased population and the changes in training doctrine compel a corresponding increase in the need for combat training facilities and the environmental impact on the PCMS to meet that need is the subject of the EIS.

The Army's projections of the total maneuver training requirements of the Brigade Combat Teams to be stationed at Fort Carson exceed the capacity of the PCMS. *Id.* at 0000093-94 & Table 2-2. An area expansion has been under consideration for several years.

A moratorium on major land acquisitions by military departments has been in effect since 1990. A waiver of the moratorium for any land acquisition involving more than 1,000 acres or costing more than $1.0 million requires approval by the Office of the Secretary of Defense.

An Analysis of Alternatives Study, dated May 6, 2004, concluded that the PCMS has a maneuver area shortfall and recommended the acquisition of additional training land adjacent to the PCMS. A.R. 172 at 0007295. The "Piñon Vision Operations Order 05-09," dated December 22, 2004, describes a plan for implementing "the long-term expansion of [PCMS] in order to obtain adequate training areas and ranges to support current and future Army and Joint force mobilization, mission rehearsal and training requirements." AR 276 at 0019157.[2] A second Analysis of Alternatives Study and a Land Use Requirements Study, both dated April 12, 2005, addressed expansion. *See* A.R. 153 & A.R. 154.

In November 2005, the Army published in the Federal Register a notice of intent to prepare an environmental impact statement for the purpose of examining the impacts to the PCMS resulting from the recommendations of the 2005 Base Closure and Realignment Commission. A.R. 142. In April, 2006, the Army conducted public hearings regarding the issues to be addressed in the PCMS Transformation EIS.

---

[2]A revised version of the Piñon Vision 05-09, was published in January 2006, entitled "Piñon Vision OPLAN 05-18." A.R. 275.

In July 2006, the Army submitted a formal request to the Deputy Under Secretary of Defense, seeking approval to acquire up to 418,577 acres of land in and around the PCMS. A.R. 274.

In apparent recognition of the legal and political complexity of acquiring more land to increase the size of the PCMS, the Army decided to proceed with an assessment of the environmental impacts of increased use of the present facility. Accordingly, on October 13, 2006, the Army published a Draft PCMS Transformation Environmental Impact Statement, identifying the proposed action as (1) increased frequency, duration and intensity of training exercises at the PCMS; (2) construction of new facilities in the cantonment, and (3) construction of new facilities in the training areas ("the Proposed Action"). A.R. 38 at 0001244.

The Army held public hearings in November 2006 on the Draft PCMS Transformation Environmental Impact Statement. Those hearings were followed by another public comment period, which ended on February 16, 2007.

On February 8, 2007 – eight days before the close of the public comment period, the Office of the Secretary of Defense approved the Army's request for a waiver of the moratorium on land acquisition. A.R. 13. Despite that approval, the Army issued the Final PCMS Transformation Environmental Impact Statement in June, 2007. On August 2, 2007, the Army issued the ROD, authorizing construction of new facilities in the cantonment area, construction of new facilities in the training areas, and an increased use of training areas at the PCMS. A.R. 3.

On April 23, 2008, Plaintiffs Not 1 More Acre!, Jean Aguerre, Mack Louden, and James E. Herrell initiated this action under the APA and NEPA, challenging the sufficiency of the Final

PCMS Transformation EIS.  Not 1 More Acre! is a Colorado non-profit corporation formed to promote the ecological and economic welfare of southeastern Colorado.  The individual Plaintiffs are residents of southeastern Colorado who are interested in preserving the agricultural, scientific, cultural, and economic resources of the region and protecting the land within and surrounding the PCMS.  The Plaintiffs' standing to pursue this action is not challenged.

NEPA requires federal agencies to prepare an environmental impact statement before taking any "major Federal actions significantly affecting the quality of the human environment . . . ."  42 U.S.C. § 4332(2)(C); 40 C.F.R. pt. 1501.  An environmental impact statement must discuss the purpose and need for the proposed action, environmental impacts resulting from the action, unavoidable adverse environmental impacts, alternatives to the proposed action, the relationship between short-term uses and long-term productivity, and the amount of resources that must be devoted to the proposed action.  42 U.S.C. § 4332(2)(C)(i)-(v); 40 C.F.R. § 1502.10.

The judicial review provisions of the APA govern this suit.  *Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1134 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 2100 (2007).  The question is whether the challenged agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).  "Because NEPA imposes procedural rather than substantive requirements, the role of the courts in reviewing compliance with NEPA is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Lee v. U.S. Air Force*, 354 F.3d 1229, 1237 (10th Cir. 2004)(quotation marks and citation omitted).  "Under this standard, [the reviewing court] must consider whether 'the [agency's] decision was based on a consideration of the

relevant factors and whether there has been a clear error of judgment.'" *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127, 1134 (10th Cir. 2007) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). "An agency action is arbitrary and capricious 'if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [if the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Utah Envtl. Congress*, 483 F.3d at 1134 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The focus of review in an APA action is the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

In the first claim for relief, the Plaintiffs allege that the EIS is deficient because it does not address the Army's plan to acquire more land to expand the PCMS. The Plaintiffs contend that the Final PCMS Transformation EIS is improperly narrow in scope, arguing that the proposed territorial expansion must be considered as a cumulative impact, a connected action, or other similar action.

"Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement." 40 C.F.R § 1508.25. Proposals or parts of proposals that are "related to each other closely enough to be, in effect, a single course of action" must be evaluated in a single environmental impact statement. 40 C.F.R. § 1502.4(a). An agency must consider "connected actions," "cumulative actions," and "similar actions." 40 C.F.R §§ 1502.4(a) & 1508.25.

Actions are considered connected if they: "(i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) Are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1)(i)-(iii). The Tenth Circuit Court of Appeals has recognized that projects that have independent utility are not connected actions under 40 C.F.R. § 1508.25(a)(1)(iii). *See Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1037(10th Cir. 2001).

Cumulative actions are those which have cumulatively significant impacts when viewed with other proposed actions. 40 C.F.R. § 1508.25(a)(2). A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. The test for whether particular actions should be considered cumulative impacts of the proposed action is "whether the actions are 'so interdependent that it would be unwise or irrational to complete one without the others.'" *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 430 (10th Cir. 1996) (quoting *Park County Res. Council, Inc. v. U. S. Dep't of Agric.*, 817 F.2d 609, 623 (10th Cir. 1987)).

Similar actions are ones "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a)(3).

"To determine the appropriate scope for an EIS, courts have considered factors such as whether the proposed segment (1) has logical termini, (2) has substantial independent utility,

-9-

(3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1183 (10th Cir. 2002), *modified,* 319 F.3d 1207 (10th Cir. 2003). An environmental impact statement does not need to include an assessment of future action that is uncertain or speculative. *See, e.g.*, *Airport Neighbors Alliance, Inc. v. United States,* 90 F.3d 426, 431 (10th Cir. 1996) ("[R]equiring a cumulative EIS analyzing possible future actions postulated in a twenty-year Master Plan that are far from certain would result in a gross misallocation of resources, would trivialize NEPA and would diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment." (quotation marks and citation omitted)).

The Final PCMS Transformation EIS addresses the relationship between the Proposed Action and potential future expansion. The EIS states:

> The transformation Proposed Action incorporates modifications to training requirements in ways that best meet training needs (see Section 2.2.4.2) and can be implemented as a stand-alone action (i.e., troop realignment, training, and construction) that does not require expanding the PCMS boundaries. That is, land acquisition is not necessary or proposed to implement the Proposed Action in the PCMS Transformation [Final] EIS.

*Id.* at 0000077. The EIS explains:

> The Army has not made any irretrievable commitment of resources for expansion; transformation can and should occur independent of expansion (i.e., it has independent utility and, as noted previously, the needs for transformation are immediate), expansion is not dependent on transformation, and approval of transformation will not force expansion to occur.

*Id.* at 0000453. *See also* Section 1.3.3, "Potential Future Expansion of the PCMS" (*id.* at 0000065-67).

-10-

The Plaintiffs' first claim for relief fails. In November 2005, when the Army moved forward with that NEPA process for the Proposed Action, there were no developed plans for territorial expansion that would permit assessment or evaluation under NEPA.[3]

In the second claim for relief, the Plaintiffs claim that the Final PCMS Transformation EIS is deficient for failing to consider an adequate range of alternatives. The focus of this claim is that aspect of the Proposed Action relating to increased frequency, duration and intensity of training exercises at the PCMS.

The Defendants argue that the Plaintiffs waived any argument with respect to whether the EIS should have considered different training intensities at the PCMS, asserting that the Plaintiffs failed to address the issue in their comments on the Draft EIS. That objection is without merit. When the Plaintiffs submitted comments on the Draft EIS, they faulted the Army for failing to provide sufficient details about the expected level of use and for limiting the range of alternatives considered. *See* A.R. 271 at 0018485 – 502. Among other comments, the Plaintiffs stated:

> In the absence of reliable information about anticipated use, agency officials and the public lack a sound basis for distinguishing among the various alternatives and thereby making a reasoned choice of action. The failure to disclose expected use

---

[3] Documents in the court record indicate that the Army's plans to expand the territorial boundaries of the PCMS have not progressed as originally planned, due to political opposition and budgetary restraints. A GAO report dated January 13, 2009 states, "After reassessing its initial plans, the Army reported that it now identifies a potential acquisition of 100,000 acres rather than the previously identified 418,577 acres for a variety of reasons including budgetary restraints, concerns about historic and culturally sensitive sites, and that a smaller expansion would affect a fewer number of landowners." (Pl.'s reply, Ex. 12.) Congress enacted budgetary restrictions in 2008 and 2009 that preclude the Army from expending military construction appropriations on the expansion of the PCMS and require the Army to submit reports to the congressional defense committees on the need for additional training land and related issues. (Defs.' surreply at 12-13.)

-11-

> levels in the DEIS is a critical flaw that prevents the public from understanding the extent of potential significant environmental impacts. As a result, the Army relies upon vague or generalized assertions describing the expected impacts to resource values.

*Id.* at 0018496. The Army was fairly informed of the Plaintiffs' challenge to the EIS.[4]

At the hearing on June 3, 2008, the Court questioned the sufficiency of the EIS's impacts analysis. The Defendants objected to consideration of this issue, arguing that it was outside the scope of the pleadings. At the Defendants' request, supplemental briefing was permitted.

There is no prejudice to the Defendants in analyzing this issue.

The Tenth Circuit Court of Appeals has instructed that when an agency makes an informed decision that the environmental impacts will be small, a less extensive search for reasonable alternatives is required. *See Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1278-79 (10th Cir. 2004) (referring to "the sliding scale by which we must measure an agency's obligations"). Conversely, when the environmental impacts would be significant, a more rigorous alternatives analysis is required. Accordingly, the Plaintiff's challenge to the EIS's alternatives analysis necessarily requires review of the Army's conclusions about the anticipated environmental impacts associated with the Proposed Action and the plan for mitigation.

The EIS evaluated two alternatives – the Preferred Alternative and the No Action Alternative. The Army determined that other alternatives, such as training troops at other locales or varying training schedules, were not reasonable alternatives because such alternatives would unduly restrict the Army's ability to implement transformation. Only the Preferred Alternative and the No Action Alternative were carried forward for detailed analysis in the EIS. The Army

---

[4]Others, such as the Colorado Department of Wildlife and the Sierra Club, made similar comments. *See* A.R. 10 at 0000832 & 0000930-931.

concluded that the No Action alternative was not feasible because troop realignment at Fort Carson has been mandated by Congress. The Army also concluded that "with implementation of mitigation and best management practices . . . there would be no significant environmental impacts associated with the selected action." A.R. 3 at 0000007; A.R. 10 at 0000200.

A major flaw of the EIS is that it contains only vague descriptions of the anticipated increase in use. The EIS states, "training under the Proposed Action may or may not be conducted 52 weeks per year." *Id.* at 0000156. The Proposed Action "includes the potential that an intensive level of training could occur over broad geographic areas or not at all." *Id.* at 0000456. The EIS states that "the Transformation Proposed Action was developed to accommodate maximum flexibility for implementation, even if installation commanders do not adopt the most intensive mission training strategy available to them." *Id.* at 0000455. The Army asserts that "[a]ctual use will be scheduled according to varying training needs and land condition, and is projected to be greater than the historical use and less than the total need." *Id.* at 0000725. These statements fail to provide any meaningful description of the anticipated intensity and frequency of the additional training activities to be conducted on this land and the consequences to the environment.

The Proposed Action permits the entire site to be used for training purposes every day of the year. *See* A.R. 10 at 0000156. Consequently, the Army's conclusion that there would be no significant environmental impacts is counter-intuitive. It is obvious that such intensive use of the PCMS prevents any meaningful mitigation of the resulting environmental impacts.

NEPA requires the agency to provide a detailed statement of "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(C)(ii).

Accordingly, an EIS must address appropriate means for mitigating adverse environmental effects. Mitigation measures are relevant to the scope of the EIS, 40 C.F.R. § 1508.25(b); the alternatives to the proposed action, 40 C.F.R. § 1502.14(f), and the consequences of the proposed action, 40 C.F.R. 1502.16(h). The record of decision must address "whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. 1505.2(c). The Final PCMS Transformation EIS addresses mitigation in Section 3.0, along with the discussion of impacts on specific resource areas. Table 3-24 of the EIS (included in Section 3.14) summarizes anticipated environmental impacts and means for mitigation. A.R. 10 at 0000193-200. Section 6.0 of the ROD addresses mitigation. A.R. 3 at 0000009-12.

The EIS appears to address mitigation but there is no recognition of the need for scheduling training in a manner that permits rest, recovery and restoration of this fragile land.

The Administrative Record includes a copy of pages from an Army power point presentation entitled "Maneuver Alternatives Analysis," dated April 20, 2006, summarizing an internal analysis of two scenarios – the "PCMS Maximum Support of Training Alternative" and the "PCMS Sustainable Training Alternative." A.R. 108. The Army concluded that "[t]o achieve full sustainability at PCMS allows 4.4 months or 20 weeks of maneuver training per year at PCMS." *Id.* at 0002816. The Final PCMS Transformation EIS ignores this assessment.

The EIS states that the Army considered training scenarios of lower intensities but did not consider them to be reasonable alternatives to the Proposed Action. A.R. 10 at 0000096. By dismissing those scenarios, the Army rejected the sustainable training alternative described in the Maneuver Alternatives Analysis. The EIS acknowledges that increasing the frequency, duration

-14-

and intensity of training exercises, and particularly an increase in mechanized training exercises, will cause substantial disturbance to soils, vegetation, wildlife habitat and cultural resources at the PCMS, especially in the maneuver training areas. *Id.* at 0000201. The EIS represents that the continuation of existing land management and environmental programs would provide adequate means for sustainable land management. *Id.* at 0000193. That conclusion is inconsistent and irreconcilable with the Army's analysis in April 2006.

The deficiencies of this EIS are apparent when it is compared to the manner in which intensity of use and mitigation were addressed in the EIS for Training Land Acquisition. The Draft EIS for Training Land Acquisition describes detailed Land Use and Management Plans, developed to assess the potential impacts to each of the two sites then under consideration. A.R. 282 at 0019769. The Draft EIS describes three scenarios for each parcel: (1) a Balanced Use/Protection Scenario; (2) an Increased Use Scenario; and (3) an Increased Protection Scenario. *Id*. Seven major variables were evaluated in connection with each scenario. Of the seven factors, "Training Intensity" and "Time of Use" were considered "the key variables and . . . most indicative of potential impacts." *Id.* "Each parcel was divided into five Management Units for purposes of training control and rotation." *Id.* at 0019770. Training intensities for all scenarios were projected, based on determinations of the "carrying capacity" of units of land within each site. *Id.* The Draft EIS for Training Land Acquisition states that "[c]arrying capacities are practical bases for estimating the intensity of military training operations that can be imposed on a land area," and that when land is to be used for military operations, carrying capacity can be assessed by reference to "the vehicle-day . . . defined as a four hour period of

-15-

activity per day for a wheeled vehicle." *Id.* 0019807. The Final PCMS Transformation EIS does not include any comparable analysis.

When the Army decided to acquire the Pinon Canyon site, the Army selected the "increased use" scenario of the Land Use Management Plans ("LUMP") described in the Draft EIS. *See* A.R. 254 at 0013648 (explaining, in response to public comments, that "[t]he Increased Use scenario was selected over the Balanced Use/Protection scenario because it increases available training area by approximately 50% each year with only a 15% increase in carrying capacity consumption.") Even the Increased Use scenario contemplated that only three of the five management units would be used during any particular year, and that each unit would be allowed to rest for two full years out of every five. *See* Figure 2-9, A.R. 282 at 0019827. In addition, the LUMP designated periods of deferment (i.e., periods of no training exercises) from "15 December – 15 January and 1 April – 30 June," recognizing that these periods of the year are particularly important for the growth of grasses. *Id.* at 0019770. The LUMP also stated that training should be deferred "whenever excessively wet soil conditions occur to prevent abnormally severe damage to soil and vegetation." *Id.*

The Final PCMS Transformation EIS states, "Because of the limited quantitative baseline data, not all potential environmental effects resulting from increased training levels can be precisely determined at this time." A.R. 10 at 0000156. That representation lacks candor. From 1985 through 2002, the Army prepared After-Action Reports ("AARs"), summarizing training exercises conducted at the PCMS. These reports show that even those limited training exercises have had severe environmental consequences. The Army produced these reports to the Plaintiffs after the close of the period for public comment on the Draft PCMS Transformation

Environmental Impact Statement, in response to Freedom of Information requests. The Army argues that this information is irrelevant. To the contrary, it demonstrates the failure of the EIS to give consideration to foreseeable adverse environmental impacts of the expected increase in training exercises and the adequacy of the plans for mitigation.

The ROD permits use of the PCMS for unlimited training twenty-four hours per day, seven days per week, 365 days per year. That intense use precludes any meaningful mitigation of the environmental impact of military operations.

The conclusion that significant environmental impacts of such unlimited use can be avoided through mitigation practices represents a clear error of judgment, and the Army's authorization of the Proposed Action was arbitrary and capricious. Under these facts, the Army cannot rely on representations about the continuation of existing mitigation efforts to limit its impacts analysis or to limit the alternatives analysis as it did.

It is noteworthy that the Army rejected the "sustainable training alternative" on the ground that lower intensity training alternatives would not have satisfied the full range of training requirements of the transformation programs, yet the training requirements of Fort Carson cannot be met at the PCMS, even if use of that facility is unrestricted. The obvious conflict between the training needs of the troops at Fort Carson and use of the PCMS in an environmentally sustainable manner makes it apparent that the Army's purposes will not be accomplished without expansion of the PCMS. The decision not to include expansion in the subject EIS does not, in itself, make it deficient. It does expose the inadequacy of the limited effort to plan to mitigate the impact of the ROD.

"[I]t is well established that NEPA does not mandate particular results, . . . nor does it require agencies to elevate environmental concerns over other valid concerns." *Lee,* 354 F.3d at 1237 (quotation marks and citations omitted). The standard for judicial review under the APA is a "deferential one," *Lee*, 354 F.3d at 1236, particularly in matters involving military affairs. *See also Custer County Action Ass'n*, 256 F.3d at 1031 ("[C]ourts afford . . . a high degree of deference in the area of military affairs . . . ."). An agency's alternatives analysis is subject to review under the "rule of reason." *Custer County Action Ass'n*, 256 F.3d at 1040. While NEPA does not guarantee a particular outcome, NEPA does require the Army to give more careful consideration to the consequences of its proposed action than what appears in this EIS.

Accordingly, it is

ORDERED that judgment will enter vacating the Record of Decision dated August 2, 2007, authorizing the Proposed Action described in the Final Pinon Canyon Maneuver Site Transformation Environmental Impact Statement dated June 2007.

Dated: September 8, 2009

BY THE COURT:

s/Richard P. Matsch

Richard P. Matsch, Senior District Judge